# Macpherson's Estate.

*Decedents' estates—Practice, O. C.—Administrators — Accounts —Reopening of adjudication—Omission of name of heir from petition for distribution—Fraud—Evidence—Laches.*

In a proceeding in the Orphans' Court for the reopening of the adjudication of an administrator's account, and for the surcharge of the administrator, it appeared that the administrator had omitted from the petition for distribution the name of one of the next of kin of the decedent, whereby the share of the administrator, who was also of kin to the decedent, was increased; it also appeared that the administrator, through his counsel, had advertised for the heirs of the decedent; and that although he had heard years before of the petitioner, he had no means of knowing, at the time of the audit, whether petitioner was alive; it further appeared that petitioner had delayed five years after learning that he had been excluded from the distribution, before taking steps to open the adjudication. The master to whom the case was referred found that the administrator had not been guilty of fraud in omitting the name of the petitioner from the petition for distribution; further found that the petitioner had been guilty of laches in failing to assert his rights at an earlier date and recommended a dismissal of the petition. The Orphans' Court sustained exceptions to the report of the master. *Held,* on appeal that the report of the master should have been confirmed.

Argued Jan. 23, 1918. Appeals, Nos. 195 and 219, Jan. T., 1917, by The Land Title & Trust Company and Merchants' Union Trust Company, from decree of O. C. Philadelphia Co., Jan. T., 1897, No. 380, sustaining exceptions to report of Master, in Estate of Catherine E. Macpherson, deceased. Before POTTER, STEWART, MOSCHZISKER, FRAZER and WALLING, JJ. Reversed.

Exceptions to report of Maurice Bower Saul, Esq., master and examiner. Before GUMMEY, J.

The opinion of the Supreme Court states the facts.

The court sustains the exceptions. The Land Title & Trust Company and the Merchants' Union Trust Company appealed.

*Frank P. Prichard,* of *Prichard, Saul, Bayard & Evans,* with him *John Stokes Adams,* for appellant.—The court was not justified by the evidence in setting aside the finding of the master that there was no actual fraud.

The court was not justified by the evidence in setting aside the finding of the master that there had been laches on the part of the petitioner: Cremer's Est., 7 W. N. C. 544; Scott's App., 112 Pa. 427.

*Axel Teisen,* with him *A. Morton Cooper,* for appellee. —Charles Begley was guilty either of fraud or gross negligence: Yung's Est., 199 Pa. 35.

The petitioner, Albert Massey, was not guilty of laches: Cottrell v. Watkins, 17 S. E. Repr. 328, 331; Wissler v. Craig's Adm., 80 Va. 22; Rochdale Canal Co. v. King, 2 Sim. (N. R.) 78; Neely's App., 85 Pa. 387; White's Est., 163 Pa. 388; Bispham's Principles of Equity, 8th Ed., Sec. 203.

OPINION BY MR. JUSTICE STEWART, March 11, 1918:

Catherine E. Macpherson, a resident of the City of Philadelphia, died 8th January, 1897. By her last will, executed some sixteen years before her death, she gave her entire estate to her husband. Her husband predeceased her. She left no issue, or brother or sister, and her estate descended to a maternal uncle, Charles T. Begley, and certain cousins standing in first degree. Letters of administration on the estate were granted to Charles T. Begley, above named, and H. B. Yerger, the latter of whom was a lawyer, the Merchants' Union Trust Company becoming surety on the bond of the administrators. The first account of the administrators was filed 1st June, 1898, and the adjudicated balance thereon was $35,609.05. On March 8, 1898, Charles T. Begley, one of the accountants, presented his petition for distribution of the funds, setting out in his petition the names of the persons entitled as heirs at law to participate, their relationship to the decedent, and the pro-

portion of the estate passing to them respectively. Thereupon distribution was accordingly ordered to the persons named, in the proportions they were severally entitled to under the law, and their shares were accordingly paid thereout.

While two later accounts were filed, the final one on 9th June, 1899, and the balance on each was distributed to the same distributees in like proportion, it is not necessary for the purpose of the argument to introduce them in this connection. They may be reserved for a later comment, if comment be necessary. On the 23d August, 1911, fourteen years after the death of Mrs. Macpherson, twelve years after the adjudication of the administrator's final account, and about five years after he claims he first heard of the distribution of the estate, one Albert Massey, with five other persons who have since dropped out of the proceedings, they having learned that they were without interest being second cousins of the decedent, filed a petition in the Orphans' Court of Philadelphia in which it was represented that the said Albert Massey was a son of William Begley, then deceased, who was an uncle and heir at law of the said Catherine Macpherson. The petition distinctly and expressly charged that Charles T. Begley, as administrator of the estate of Mrs. Macpherson, and the parties to whom the estate had been distributed, "had fraudulently concealed the existence of the said William Begley and his descendants" and prayed for a citation upon Charles T. Begley to show cause why he should not be surcharged with $8,597.37, claimed to be the amount of the petitioner's share, and upon the distributees to show cause why they should not be required to pay into court proportionate amounts of this sum respectively. Upon answers filed denying the fraud, charging laches on part of the petitioner, and averring that the petition improperly included several and distinct adjudications, the court referred the case to Maurice Bower Saul, Esq., as examiner and master. The master found that the petitioner,

Albert Massey, since deceased, was a first cousin of the decedent and son of William Begley, deceased; he further found that the omission of the name of William Begley, the petitioner's father, from the list of next of kin entitled to share in the estate from the petition of Charles T. Begley praying for an order of distribution on the first account, was not through any fraudulent design to deprive petitioner of his distributive share in the estate, and that the petitioner had been guilty of laches. In accordance with these findings the master recommended a dismissal of the petition. Upon exceptions to this report the Orphans' Court, holding that the failure of Charles T. Begley to mention the deceased uncle, William Begley, in his petition for distribution constituted actual fraud, and that sufficient excuse for petitioner's delay in bringing suit was derivable from the evidence, remanded the report to the master for supplemental report and findings in accordance with the view expressed by the court. Upon such supplemental report being returned by the master, the court entered a decree directing that the confirmation of the several accounts, so far as related to the one-fifth of the balance shown by each, should be set aside, and that the estate of Charles T. Begley, who had been one of the administrators, since dead, should be surcharged with $8,597.37, with interest. The appellant is the Land Title & Trust Company, which by leave of court intervened as successor to the Merchants' Union Trust Company, which had become surety of Charles T. Begley on his administration bond.

The first question to be considered is that raised by assignments one and two. These complain of the reversal of the master's original findings, and his refusal to affirm the petitioner's thirteenth request for finding which was "That Charles T. Begley, concealed from the court the fact that Catherine E. Macpherson had another maternal uncle, to wit, William Begley, and that the said William Begley had children," and his refusal to affirm petitioner's third request which was "That

Charles T. Begley was guilty of fraud when he concealed from the court the fact of which he had original knowledge that another maternal uncle of decedent had children." The charge of fraud had no relation whatever to any other feature or fact in the case than the absence of the name of William Begley from the list of decedent's relatives entitled to participate in the distribution, which was submitted to the auditing judge by Charles T. Begley, in accordance with the standing rule. The burden assumed by the petitioner was, to prove clearly that the omission of the name of William Begley therefrom, was with fraudulent intent. "It is not enough to charge fraud and prove in support thereof slight circumstances of suspicion only. To be of any avail it must be clearly proved": Mead v. Conroe, 113 Pa. 220. These are among the uncontroverted facts in the case, so found by the master. William Begley, the father of the petitioner, was an elder brother of Charles T. Begley, the respondent. He died at the age of seventy years, thirteen years before the death of Mrs. Macpherson, the intestate, and was buried from the home of a sister residing in Philadelphia. The fact of his death and notice of the time and place of his funeral were published in the Public Ledger, a daily newspaper published in the City of Philadelphia, and yet his funeral was unattended by any wife or children. He had been married early in life to a woman named Jane Massey, with whom he had lived until some time prior to 1860, and by whom he had several children, among them this petitioner, Albert. He was a man of intemperate habits. A separation occurred between him and his wife some time prior to 1860, for as early as 1860, the wife, who had retained the custody of the children, was living in Philadelphia with one Darrah as the latter's wife. At this time—how much earlier does not appear—the children begotten by Begley were named and called Massey. In 1860 or 1861, Darrah took this woman and her children to live in Holmesburg, where they continued to live as husband and wife. All the chil-

dren thereafter went under and grew up with the name
of Massey, while the mother went under the name of
Darrah. There was no evidence that there was any di-
vorce between Begley and his wife, Jane Massey. Wil-
liam Begley thereafter was without fixed home so far as
the evidence shows. There is no evidence that his chil-
dren had any communication in family way or otherwise
with either Catherine E. Macpherson, the intestate, or
with any of the brothers or sisters or other relatives of
their father, nor were they known as members of the Beg-
ley family. This was the situation of affairs when, about
September, 1906, the petitioner, Albert Massey, for the
first time learned of the death of the intestate. Within
a very short time thereafter he called to see Charles T.
Begley, the respondent, and made known to the latter his
claim to share in the estate of the intestate, as the only
surviving child of William Begley. The petition for
review was filed 23d August, 1911.

Turning now to such of the evidence as reflects light
on the real question, whether the name of William Beg-
ley was omitted from the list of those entitled to share
in the distribution by Charles T. Begley, with fraudu-
lent intent to deprive the heirs of William of any share
in the inheritance, what have we? Admittedly no direct
evidence, but facts and circumstances which it is con-
tended on the part of the appellee warrant a safe, if not
conclusive, inference that the omission was with fraudu-
lent design. The true significance of these facts and cir-
cumstances can be properly understood only as we con-
sider in connection therewith what the evidence dis-
closes as to the personality of William Begley, and as
well the personality of his brother, Charles T., the re-
spondent, and the relations of each to the other. In the
petition for review, Albert Massey, the son of William
Begley, thus describes his father. "He was a man of
most intemperate and brutal habits, and in the course
of some years after their marriage it became necessary
for his wife, the said Jane Massey (petitioner's mother),

in order to protect the life and health of herself and children, to separate from him and live apart from him together with her children; that the said William Begley resenting the aforesaid separation by his wife would constantly seek her out, and having found her address would invade her residence in a drunken state and violently chase her and her children out of the respective houses in which they at such time were living; that having in this way been driven out in the street by said William Begley as many as ten times or oftener, the said Jane Massey, wife of the said William Begley, finally, in order to save herself and her children from the violence and brutality of her said husband moved to Holmesburg, and in order that said William Begley could not as easily find her, resumed her maiden name of Jane Massey, and let all of her children be known by the name of Massey, and the same was the case with their descendants...... That at the time of the separation of the said Jane Massey from her husband, the said William Begley, all of their children were small, none of them more than about ten years of age......the only surviving child of said Annie (sic) Massey and William Begley, being Albert Massey." Albert Massey being called as a witness testified that he remembered his father and mother living together on Christian or Catherine streets between Second and Third, kind of a court or alley, and that thereafter his mother moved to a place at Twelfth and Melon streets, and his father was left behind, and afterwards to a place called Sergeant street and then to the Pearl street house; that from the time he was nine years old he never took the name of Begley, and that he had no recollection of having been called Begley and his information as to his father's name was derived from his mother. We here introduce these facts not for the purpose of showing discrepancy between what is here averred as to the occasion for the wife's removal to Holmesburg, and the actual fact found by the master, viz, that before her removal she had been cohabitating

with one Darrah as his wife, and that it was Darrah
who made the removal to Holmesburg taking William's
wife with him and her children, and that both there re-
sided as man and wife during the remaining years of
their life, but to explain what otherwise may seem a
strange and improbable indifference on the part of the
respondent towards an elder brother in allowing all in-
tercourse between them to cease through these many
years, never knowing or inquiring of any one as to the
circumstances, condition or home, if he had one, of his
brother.   We give the explanation for whatever it is
worth.   There is sufficient in the evidence to show that
William during this period underwent no reformation,
but remained without home or family, and in great
measure dependent, being a cripple, until he died in
1886.   During this period Charles T. had married, estab-
lished for himself a home and was a man of family.
William called three times at his home, two of these calls
being made while intoxicated.   He would occasionally
call to see his sister who lived in the neighborhood and
Charles would occasionally meet him there, but on no
occasion did he inquire or learn from William anything
in respect to his family.   They were virtually strangers
to each other.   At the time Charles T. testified before the
master he was eighty-three years of age.   In testifying
he recalls an incident that occurred more than seventy
years before.   It was, if not the only, certainly the last
time he ever saw any of William's children, barring the
petitioner.   William had been injured in one of his
hands while working at his trade, that of last maker,
and he was for a time an inmate in a hospital in conse-
quence.   Charles T., then a boy of ten years, was given
money from time to time by his father to take to William
in the hospital.   On perhaps several of these occasions
he stopped at William's home on Dock street and there
saw three children, all younger than himself, and
learned that they were the children of his brother.   Never
at any time thereafter did he see any of these children,

nor did he see again his brother, William, until he himself had reached man's estate, was married and the head of a home. It must have been very shortly after Charles had visited this home on Dock street and learned of the existence of these children, that the children were taken · by their mother to Holmesburg and given the name of Massey. The name Begley thereafter disappears from the family. This fact was unknown to Charles, so he testifies without contradiction and with nothing in the case to discredit him. When he submitted his statement as to who were entitled to share in the estate he knew that his brother, William, was dead; with respect to the latter's children he knew nothing except that seventy years before he learned that William then had three children living in his home bearing his name, but as to what had become of them, whether any had survived their father, and whether any had married and left children, he was wholly in ignorance. In determining the attitude of mind of the respondent when he filed the list of intestate's relatives entitled to take, and omitted therefrom mention of his brother William's family, these facts are not to be overlooked. Respondent was then about seventy years old, and his brother William had been dead for fifteen years. He had lost sight of William's three children whom he had once seen when he was a boy of ten years, and never after. These children had been taken to reside elsewhere and had been given another family name than Begley, a name unknown to the respondent. Toward the later years of William's life Charles would see him occasionally but never learned from him, or anybody else anything relating to his wife, or anything with respect to his children. Evidently he assumed when he came to make the statement, which he filed with the auditing judge, from what he had seen of his brother, that he was without home and alone in the world. Nothing had occurred after William's death to make him think otherwise. It was under such circumstances that the statement was filed. So much with re-

spect to the conditions and circumstances under which the omission of William's name occurred. If the case presented nothing more than the facts we have referred to, the view expressed by the learned judge of the Orphans' Court in giving as his reason for the reversal of the master's finding, that the evidence "raises a doubt as to the good faith of Charles T. Begley in making the affidavit which he did, when it is remembered that his share was considerably increased by the elimination from the distribution of William Begley's children" might by some be seriously entertained; but to our mind the evidence yet to be considered is more than sufficient to overcome and remove such suspicion.

Associated with Charles T. Begley as coadministrator was H. B. Yerger, Esq., a reputable lawyer, since deceased, a member of the law firm of Peace & Yerger. So long as he lived Mr. Yerger took an active part in the settlement of the estate. It appears by the testimony of Mr. Peace that the legal side of the settlement of the estate was committed to the firm of Peace & Yerger, through Walter B. Morris, a son-in-law of the respondent, now a confirmed invalid who was unable to testify, and who, with Mr. Yerger, took active charge in trying to find out where the heirs of decedent were. Mr. Peace in his testimony says, "At or about the time that Charles T. Begley and Harry B. Yerger were appointed administrators they caused advertisements to be inserted in the public newspapers stating in substance that it would be to the interest of anyone connected with William Begley to apply to Peace & Yerger, attorneys; that they also advertised in newspapers for the relatives and heirs of another Begley, which advertisement brought response from a lady in New York State, who turned out to be the daughter of John Begley, deceased, a brother of respondent; that respondent, at or about the time that letters of administration were granted (and this must have been at least a year before any statement was filed by the respondent)

in advising with him as counsel, told him that he thought
William had been married at one time, and gave that as
a reason for causing the advertisement referred to to be
inserted, in order if there were any (children of deceased
brothers or sisters) he could reach them." Counsel
caused advertisement to be made through newspapers in
Philadelphia and New York, as well, for information
with respect to the descendants of John Begley, formerly
of Philadelphia. Mr. Peace was asked "Was the thought
that there might be some descendants of William Begley
which prompted you to advertise based on fact, or was
it done out of extra precaution?" He replied "I think
I might answer and say both on fact and extra pre-
caution, because as I remember it now, Charles T. Beg-
ley had some knowledge that his brother had been mar-
ried; he did not know from having been at the marriage
ceremony, but he had heard something about his living
with a woman down town some place, and Mr. Yerger
and I thought it would be well to try and find them, and
Mr. Morris being a man of considerable means and lei-
sure went out to look it up for us, but his efforts proved
unavailing." When it is remembered that all this pre-
ceded the filing of any statement by respondent by at
least a year, that it was done with the consent and ap-
proval of respondent who voluntarily gave the informa-
tion that led to the advertising, if the testimony be ac-
cepted as true, and it is in no wise discredited, what
possible basis is left for the charge to rest upon that the
respondent in his statement of who were the heirs at
law of intestate with fraudulent design omitted or sup-
pressed the name of his deceased brother, William, and
the fact that he left children surviving? The master
could find none, nor can we.

The master further found that the petitioner had been
guilty of laches. Laches presupposes a knowledge of ex-
isting conditions on which a right depends. When such
knowledge exists, no matter how acquired, equity de-
mands vigilance on the part of him who would seek to

establish such right. Equity declines to take jurisdiction of a case after great delay. The cases are numerous which hold that a delay for less than the period of the statute of limitations may be a bar to relief, and that each case must be judged by its own facts and circumstances in determining whether the suitor is concluded by delay in asserting his rights, and no particular citation of them is here required. Among the facts and circumstances which here called for vigilance were these: The petitioner was first made acquainted with the fact that his father, William Begley, then deceased, was an uncle of the intestate, that he himself was the sole heir of his father, though known by the name of Massey, and that the intestate's estate had been settled and distributed to and among other kindred to the wrongful exclusion of himself, in 1906. This was nine years after the death of the intestate and seven years after the adjudication of the final account of the administration. Petitioner was then fifty-four years of age. One of the administrators of the estate was then dead, and the surviving one, petitioner's uncle, to whom he was wholly unknown, was then seventy-six years of age. Petitioner with full knowledge of these facts delayed bringing his action to establish his right to participate in the estate until 23d August, 1911, when he filed the present bill. Certainly a delay of nearly five years, during which period petitioner knew that the money belonging to himself was in the hands of others, claiming and using it as their own, especially as petitioner's claim rested wholly on oral testimony, would be full warrant for a court of equity withholding relief under such conditions as here existed, except as excusing and justifying circumstances were shown. The excuses offered were that he had committed his case into the hands of four different lawyers, each of whom had disappointed him in some unexplained way, and that for part of the period he was suffering from an illness which confined him to his home during the winter months. This opinion has grown to

too great length to justify a discussion of the evidence on this branch of the case. It is only necessary to say that upon careful examination of it we find nothing in it to condone the petitioner's manifest laches. We agree with the finding of the master, in his first report..

We have confined the discussion to the case on its merits. Questions of no little importance are raised involving the pleadings, which but for the conclusion we have reached on the merits would require careful consideration. In view of these conclusions further reference to them is unnecessary. The decree is reversed; the first report of the master is confirmed, and the bill is dismissed; the costs to be paid by the appellee.