# Mead *versus* Conroe.

1. While fraud may be proved like any other fact by evidence tending to establish its existence, yet it is a serious accusation, and is not to be lightly inferred. It is not enough to charge fraud and prove in support thereof slight circumstances of suspicion only. To be of any avail it must be clearly proved.

2. A charge of a corrupt agreement whereby a debtor by means of a sheriff's sale had his real estate conveyed to another for the purpose of hindering, delaying and defrauding his creditors, must be proved by evidence of a satisfactory character, and if there is no such evidence the jury should be so instructed, and the case withdrawn from their consideration.

3. That a judgment creditor bought the prior judgments, liens against his debtor's real estate, including a judgment upon which an execution had been issued, and upon which said real estate was advertised by the sheriff, and at said sheriff's sale purchased the real estate at a price considerably less than its actual value, and permitted his debtor to remain in possession of it, is not ground for the inference of a fraudulent purpose to hinder, delay and defraud the creditor of his debtor.

4. If a purchaser at sheriff's sale agrees with the defendant in the execution that he will convey him the property upon being reimbursed for all the money he has expended, such an agreement is perfectly lawful, and is no evidence of fraud.

March 3d, 1886. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, GREEN and CLARK, JJ. STERRETT, J., absent.

ERROR to the Court of Common Pleas of *Warren county :* Of January Term 1885, No. 66.

This was an action of ejectment brought by James P. Conroe against Darius Mead for six different tracts of land in Warren county. Plea, not guilty.

The case was tried before WILLIAMS, P. J., of the Fourth Judicial District.

The defendant claimed title to the lands described in the writ, by virtue of a purchase by him at a sheriff's sale of the lands as the property of David Crull.

[Mead v. Conroe.]

The plaintiff claimed title to the same lands under a purchase by him at a subsequent sheriff's sale on a writ in his own favor against said David Crull.

At the time of the sale at which Mead purchased, to wit, December 3d, 1878, there were some ten judgments against David Crull, amounting in all to nearly $2,500. Mead owned the tenth and last judgment, upon which there was a little less than $500 due. The 1st, 3d, 4th, 5th and 6th judgment liens, amounting to about $973, belonged to Stern & Stein, non-residents of the county. The 2d judgment lien, amounting to about $673, belonged to Dr. A. C. Blodget.

On November 12th, 1878, Stern & Stein issued a *fi. fa.* upon one of their judgments, the fifth lien against Crull. By virtue of this execution the sheriff made a levy upon the lands in controversy, and advertised them to be sold on Monday, the 2d of December following, at the court house in the borough of Warren. The description for the levy was prepared by the attorneys of Stern & Stein, and furnished the sheriff. Other writs of Stern & Stein against Crull had been in the sheriff's hands before, upon which a portion of his personal property had been sold a few months previous.

The plaintiffs gave evidence, under objection, of an alleged fraudulent sale of personal property on the 9th of November preceding the sale of the real estate, on the writ of Mead *v.* Crull. But this sale had no connection in any way with the sale of the real estate. It was a public sale and there were many bidders present.

Before the sheriff's sale of the real estate Mead purchased the judgments of Stern & Stein, including the one upon which the *fi. fa.* was issued, and also the judgment of Blodget, and had them duly assigned to him, paying for them partly in cash and partly by his own judgment notes. Pending the purchase of these judgments Stern & Stein had the sheriff's sale adjourned until the following day.

At the sale Mead was the purchaser, he being the highest bidder, for $700.

The value of the real estate thus purchased was estimated by the witnesses to be about $10,000.

At the time of the sheriff's sale to Mead the plaintiff was an endorser upon Crull's note for $1,000, then held by the First National Bank of Warren. This note was renewed two or three times after said sheriff's sale. Finally the plaintiff paid the last renewal, brought suit, and recovered judgment on September 5th, 1879. Upon this judgment execution was issued, the lands in controversy were levied upon and sold as the property of David Crull, and bid off by the plaintiff for five dollars a tract, which constitutes the plaintiff's title.

[Mead *v.* Conroe.]

The remaining facts of the case sufficiently appear from the opinion of the Supreme Court.

The defendant presented, *inter alia*, the following points:

4. That there is no sufficient evidence in this case either to implicate Darius Mead in any purpose or design, collusion or conspiracy, by purchase of the real estate of David Crull at the sheriff's sale under the Stern & Stein execution to delay, hinder or defraud James P. Conroe, the plaintiff, or the First National Bank, which held the note on which the plaintiff was an endorser, or to charge said Darius Mead with notice or knowledge of such purpose or design, to authorize the jury to find a verdict for the plaintiff, and their verdict must be for the defendant.

*Answer.* Declined. The question presented in this point submitted to the jury. (Fifteenth assignment of error.)

8. There is no sufficient evidence connecting the transactions of the sheriff's sale of the personal property of Crull with the sheriff's sale of the real estate in controversy to affect the latter with fraud, even if the jury should believe from the evidence that the former was tainted with fraud.

*Ans.* This question we submit to the jury. We decline to pass upon it. (Eighteenth assignment of error.)

14. That under all the evidence the plaintiff is not entitled to recover, and the verdict should be for the defendant.

*Ans.* Declined. (Nineteenth assignment of error.)

Verdict for the plaintiff for the land described in the writ and judgment thereon, whereupon the defendant took this writ, assigning for error, *inter alia*, the answer of the Court to the defendant's points as above indicated.

*D. I. Ball* and *R. Brown* (*C. W. Stone* and *C. C. Thompson* with them), for plaintiff in error.—The competency, relevancy and weight of the evidence is for the Court.

Unless the whole evidence would warrant a verdict for the plaintiff, it was error for the Court to submit to the jury, as questions of fact, evidence of slight circumstances which might be construed either to be fraudulent or innocent.

There was not sufficient evidence of fraud in this case to submit to the jury.

*W. W. Wilbur* and *C. H. Noyes*, for defendant in error.— The learned counsel seem to suppose that because Mead acquired the title at a sheriff's sale, it cannot be assailed except upon grounds which would make him a trustee *ex maleficio* as to the former owner. He argues that even if Mead and Crull had made the corrupt agreement charged by the plaintiff, and which the jury have found he did, that "when he stood among

[Mead v. Conroe.]

the bidders at a *bona fide* sale, and bid off the real estate, paying for it with his own funds, that such a title would . . . . . be good." And hence that all evidence as to the circumstances surrounding the sale was incompetent.

The jury have found that Mead and Crull did make the corrupt agreement. That the sale was permitted by Crull, and the purchase made by Mead in pursuance of it. How then can the sale be said to be *bona fide?* If an innocent person had purchased instead of Mead he might have taken a good title, but Mead controlled the execution, and had it in his power effectually to prevent any such occurrence. If there had been any troublesome interference by the bystanders he could adjourn the sale, or take such other steps as were made necessary by the circumstances. Not being interfered with he accomplished the purpose agreed upon between himself and Crull by means of a sale regular and adverse in its outward appearance, but in truth no different from a conveyance by deed from Crull made for the same fraudulent purpose: Kepner *v.* Burkhart, 5 Barr, 478 ; Zerb *v.* Miller, 4 Harris, 497 ; Ashmead *v.* Montfair, 1 Id., 583 ; Burr *v.* Ahl, 5 Casey, 387 ; Gilbert *v.* Hoffman, 2 Watts, 66 ; Hoffman *v.* Strohecker, 7 Id., 86.

In his 15th, 18th and 19th assignments of error, the counsel seems to assume that the Court should have decided the questions of fact. That there was no evidence upon the points presented he certainly cannot claim. Even if there had been but slight evidence it must have been submitted to the jury : McMichael *v.* McDermott, 5 Harris, 353 ; Hester *v.* McGrath, 8 P. F. S., 459.

Mr. Justice GREEN delivered the opinion of the court, October 4th, 1886.

In this case it was clearly proved and not at all contradicted that Mead purchased the judgments of prior lien creditors, which were transferred to him for a full consideration, being the whole amount due on each judgment, part of which he paid at the time, and the remainder subsequently. As this purchase was not made until the day fixed for the sale of the real estate, and there was no proof of a previous agreement with Crull, that he, Mead, should make the purchase, there is absolutely no evidence that it was done in pursuance of a preconcerted design and agreement with Crull, or with any one. It was also an undisputed fact that Mead had no agency in the proceedings for the sale of the real estate. He did not cause the writ of execution to be issued, nor is there any evidence that he ever had knowledge that it was issued, or that the property was to be sold until very shortly before the day

of sale.  He held a junior judgment, and on the day fixed for the sale he did what any lien creditor in his position was perfectly justified in doing, bought up the judgment upon which the execution was issued and several other of the prior liens. His action in this respect does not afford the slightest evidence, not even a scintilla, of a dishonest or fraudulent purpose.  It was further affirmatively proven and not at all contradicted, that Mead did not interfere with the sheriff's sale, did nothing to deter bidders, and bought the land in question as the highest bidder, at a public, fair, judicial sale, open to all bidders, which has never been questioned or impeached in any manner. The fact of a purchase in such circumstances at a price considerably less than the actual value of the property, is no ground for the slightest inference of a fraudulent purpose.

The validity of his title is impeached upon the ground "that as early as July, 1878, David. Crull and Darius Mead entered into a fradulent agreement that, for the purpose of hindering, delaying, and defrauding the creditors of Crull, all Crull's property, real and personal, should be transferred to Mead by means which would be apparently legal, Mead advancing whatever money was absolutely necessary, but to re-convey to Crull whenever he should be repaid, and Crull should be ready to take back his property."  The burden of proving this corrupt agreement, of course, rests upon the plaintiff Conroe.  It is scarcely necessary to say that before a man's title to real estate, purchased at an open public judicial sale for the highest price offered, can be swept away upon such an allegation as is here made, the substance of the charge must be proved by evidence of a satisfactory character, and if there is no such evidence in the case, the jury should be so instructed and the case withdrawn from their consideration. We have patiently read and studied every particle of the testimony in this case, and have reached the conclusion that there is no evidence in it which is at all sufficient to prove the truth of the allegation made.  Very much stress was laid upon the fact that the defendant had purchased the judgment and execution upon which the sale was made, and had acquired the property at a very low price.  Of course, if the sale had been a private one, there would have been very much force in the position that it was made at an undervaluation.  But in the case of a sheriff's sale, open to all bidders, the fact of a small price is entitled to no weight whatever as the basis of an inference of fraud.  So too it was most earnestly argued that, because Crull remained in possession of the property sold, such possession was a badge of fraud.  But while it is very true that such an inference attaches in case of a private sale, it has been repeatedly held that it does not arise in case of a

[Mead *v.* Conroe.]

judicial sale. So too if the purchaser at a sheriff's sale agrees with the defendant in the execution that he will convey him the property upon being reimbursed for all the money he has expended, such an agreement is perfectly lawful and is no evidence of fraud. In a case like the present, the evidence must go much further than this. There must be satisfactory evidence from which a rational inference may be drawn, that there was a corrupt design and agreement to hinder, delay, or deprive the creditors of the debtor by putting his property out of their reach. There is in this case not a particle of original evidence that such an agreement ever was made. Both the parties, Mead and Crull, were examined, and both testified in the most positive and absolute terms that no agreement or understanding of that kind had ever been made or even talked about between them. Not a single witness testified to any personal knowledge of the fact of such, or of any, agreement between the parties, or of any kind of an arrangement having for its object the exclusion of Crull's property from his creditors. The undisputed evidence as to the manner in which Mead acquired the judgments prior to his own, the amount of money he paid for them, and the absolute fairness of the sheriff's sale as appears by the testimony, affirmatively disproves the existence of a preconcerted design to defraud the creditors, so strongly, that nothing less than clearly satisfactory evidence to the contrary should be permitted to defeat a title so acquired. There is no such evidence in this case. The testimony principally relied on in support of this theory is the evidence of certain declarations alleged to have been made by Mead and Crull to the effect that Mead's purchase was made in order to defraud Crull's creditors. When that testimony is examined and analyzed it is found to be of the weakest and flimsiest character. In reality, there is but one witness who testifies to a clear admission by Mead that there was any understanding or agreement on his part to hold the property so as to keep it from Crull's creditors. That witness described a conversation which occurred at her own house at Bradford, in the spring of 1880, which was fifteen or more months after Mead had acquired his title at sheriff's sale. It was Mrs. McKinney, and she was a daughter of Crull's. She said : " I spoke to Mr. Mead about his getting father's property into his hands, and he said he had taken his property to save it for him and to keep off his creditors, and he intended to give father a chance to get his property back by giving him a chance in an oil well at Summit City." As all of this, except the expression " to keep off his creditors," is entirely consistent with an innocent purpose, it might well be questioned whether, allowing for the infirmities of memory and the possible misappre-

3 AMERMAN—15

hension of the meaning of words, it should be held sufficient
to deprive a citizen of his title to real estate purchased at a
judicial sale, but its authenticity is so strongly impeached as
to deprive it of any legal efficacy for that purpose.  Not less
than five other persons swear that they were present at the
time and place when this alleged conversation took place, and
every one of them denies that it occurred.  They were Darius
Mead, David Crull and his wife, and Nelson Crull and his
wife.  Nelson Crull says he was not present the whole of the
time, but his wife says she was, and no such conversation took
place.  Mead and David Crull both deny it absolutely and
positively, and Mrs. David Crull says she was present all the
time, and heard nothing of the kind.  While it is true that
juries are the judges of the credibility of witnesses, they have
no unlicensed privilege to accept the uncorroborated assertion
of one witness and disregard, without reason, the opposing
and concurring testimony of five equally credible witnesses
with equal opportunities of observation and knowledge.  If
they do this, however, it is within the power of the court try-
ing the case, and of this court sitting in review, when a proper
point raises the question of the sufficiency of the whole testi-
mony, to pass upon that question also, and declare its convic-
tion, notwithstanding the verdict.

Another witness, who testified to Mead's declarations, was
James Crull, a son of David Crull.  He said :  " I saw Mr.
Mead in Youngsville, and he came up to me and said he un-
derstood that I accused him of cheating the heirs.  He said
what he did down there for Mr. Crull was to help him ; that
it was not to cheat any one.  There was further conversation
between us, but I don't just remember what it was.  He said
he bid the property off for Mr. Crull.  I heard a conversation
with Mead before the real estate was sold.  There was a tim-
ber lot on the other side of the river, and they were talking
about putting in some timber, and Mr. Crull said he supposed
if he put it in some one would put on to it, and Mr. Mead
said he would fix that all right.  The timber was not put in ;
the job was started, but the timber was not brought to the
river."  Q. " Do you remember anything else that Mr. Mead
said as to how he could fix that all right? "  A. " So that Mr.
Crull's creditors should not take it away from him.  That was
shortly after he bid in the personal property."  The witness,
without stating what Mead said, gives his own construction of
his words ; but as this conversation took place before the
sheriff's sale, and before Mead purchased the prior judgments,
it has no relevancy to the actual acquisition of the title, and
would be altogether inefficient to defeat it if it were otherwise
honestly acquired.  Only one other witness testifies to declara-

tions by Mead, and he is Conroe, the plaintiff. The most of his testimony relates to what took place at the sale of the personalty, and describes conversations with Crull which he says Mead might have heard, because he *supposed* he was near enough ; he was " handy around in the yard, which was about the bigness of this court-house ; " he was " not very far there— handy." The conversation did not relate to the real estate, but to the personalty, and the giving of the judgment to Mead. The only conversation with Mead, which he repeats, was the following :   Q.  " Did you meet Mr. Mead in Warren about the time of the sale of the real estate ? "  A.  " I did.   I didn't know it was the day of the sale at that time when I met him, until he told me.   I am a man of not very good learning.   Mr. Mead came along on the sidewalk, and he says : ' Conroe, what is the best way to help Crull ? '   I told him I didn't know.   I says, I have not thought anything about it. He says, ' I want to help him.'   Then he says, ' Isn't it the best way to let it go to sale and bid it in for him ? '   I says to him that I hadn't thought anything about it, but, says I, as long as you are helping him, help him to the best advantage you can.   Then he says, ' What I am doing I am doing for Crull.  I am not doing anything to take advantage of anybody.' " It is simply idle to speak of this conversation as proving or tending to prove a purpose to defraud Conroe, who is the only creditor alleging such a purpose, or any other creditor.   It might be very good evidence in support of an action by Crull against Mead to recover the land after tendering to Mead an amount sufficient to reimburse him ; but to regard it as evidence to prove fraud by Mead against Conroe is the merest folly.   He inquires of Conroe what is best to be done to help Crull, and asks his advice whether it would not be best to bid in the property, and Conroe not only makes no objection, but practically encourages him in doing just what he did do.   The very fact that he conferred and advised with Conroe as to what should be done is the strongest evidence that he had no purpose of defrauding either Conroe or any other creditor. The purpose of holding the property for Crull and subsequently allowing him to redeem, would not be a fraud upon creditors.   On the contrary, it would be assisting him to acquire the means of payment.

Some effort was made to impeach the judgment given by Crull to Mead, but the full consideration of that judgment was proved by three witnesses and contradicted by none.

The occurrences at the sale of the personal estate were such as constantly take place at such sales, the property being purchased, or most of it, by Mead, because there were no other persons bidding higher prices.   There were also some declara-

[Mead *v.* Conroe.]

tions of Crull given in evidence; they were doubtless admissible in evidence, but were not in our judgment at all sufficient to deprive Mead of his title to the real estate. Unless there was very clear proof connecting Mead with a purpose existing in Crull's mind to defraud his 'creditors, Mead cannot fairly be held responsible for such a purpose, and we do not think there is any satisfactory evidence establishing such a connection. Of course, if it was a case of a private sale or transfer by Crull to Mead, the situation would be very different. Crull's declarations would then have a much greater significance. But there was nothing of that kind. It was not in Crull's power to give Mead title by sheriff's sale. It does not appear that Crull had the slightest agency in promoting the sale. In point of fact it was most manifest that neither he nor Mead had anything to do with bringing about that sale. Nor is there the slightest pretence of any collusion with the judgment creditors to bring on the sale or permit Mead to control it. There are, of course, many small circumstances in evidence which might be expected if there was a fraudulent purpose, but they were equally consistent with an innocent purpose, and hence do not of themselves, whether taken singly or collectively, justify an inference of fraud. While fraud may be proved like any other fact, by evidence tending to establish its existence, yet it is a serious accusation, and is not to be lightly inferred. In Morton *v.* Weaver, 3 Out., on p. 52, we said : " If we were to permit judgments and other judicial proceedings to be brushed aside on naked allegations of fraud and other flimsy pretexts, titles would, indeed, rest upon a very insecure foundation. It is not enough to charge fraud and prove in support thereof slight circumstances of suspicion only. To be of any avail it must be clearly proved." In our opinion the whole of the testimony in this case is inadequate to satisfy the reasonable conscience and intelligent judgment that there was either an agreement between Mead and Crull to put the title to the lands in question into the hands of Mead for the purpose of defrauding Crull's creditors, or that there was any such purpose existing in Mead's mind. There may have been some slight circumstances of suspicion, but these are not enough; they constitute no more than that scintilla of proof which in the most enlightened courts of the present day is not permitted to produce a verdict.

We sustain the fifteenth, eighteenth, and nineteenth assignments of error, and on them the judgment is reversed. The other assignments are dismissed.

Judgment reversed.