## Drueding et al., Appellants, *v.* Tradesmens National Bank and Trust Co.

Argued April 25, 1935. Before FRAZER, C. J., KEP-
HART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Robert T. McCracken,* with him *J. Warren Brock,
Franklin S. Edmonds* and *Edward G. Taulane, Jr.,* for
appellants.

*Ralph B. Evans,* for appellee.

OPINION BY MR. JUSTICE LINN, May 27, 1935:

This appeal is from the refusal to take off a compulsory
nonsuit. The action was trespass. Plaintiffs alleged
breach of trust[1] by defendant mortgage trustee.

On June 1, 1924, S. B. and B. W. Fleisher, Inc., a cor-
poration of Pennsylvania, for many years engaged in the
manufacture of woolen yarns in the City of Philadelphia,
and hereafter referred to as the Company, made its mort-

---

[1] The statement of claim charged "a breach of trust on the part of
the said defendant, and a violation of the duties and obligations
owing by the said defendant, as trustee for the benefit of the holders
of the said first mortgage bonds, to the said bondholders, and that its
conduct and action in the premises constituted a fraud upon the
rights of said bondholders, rendering the said trustee [defendant]
liable to the said bondholders, and to the committee as the present
owners and holders of said bonds, for the damages which resulted
from its conduct and actions aforesaid."

gage to secure an issue of first mortgage bonds in the amount of $2,000,000. The trustee, Guarantee Trust and Safe Deposit Company, merged with the Tradesmens National Bank, forming the Tradesmens National Bank and Trust Company, which then succeeded to the mortgage trusteeship; it is the defendant and will be referred to as Tradesmens Bank.

The breach of trust is said to have been defendant's conduct in executing a loan agreement and permitting it to be enforced, which, plaintiffs say, "was in fact a deliberate conspiracy to deprive the bondholders of their right to participate in the general assets of the Fleisher Company." The agreement was executed October 28, 1929. At that time, defendant was a bank loan creditor of the Company (a relationship with Tradesmens National Bank that began prior to its merger with the Guarantee Trust and Safe Deposit Company and continued thereafter). Appellants complain that as creditor of the mortgagor, defendant did not act in good faith as trustee for bondholders.

The trustee owed to bondholders and to the Company duties and obligations created by the mortgage, the bonds, and the general law governing trust relationships: Sprigg v. Com. Title Ins. Co., 206 Pa. 548, 555, 56 A. 33; Struthers Coal & Coke Co. v. Union Trust Co., 227 Pa. 29, 75 A. 986; Northampton Trust Co. v. Northampton Traction Co., 270 Pa. 199, 112 A. 871, and Moyer v. Norristown-Penn Trust Co., 296 Pa. 26, 145 A. 682. On the other hand, it was also engaged in the banking business with duties and obligations to its depositors and stockholders. Whether, as appellants allege, the evidence supports the charge of breach of trust, or is consistent with the exercise of good faith and due care in the conduct of its trust relationship in the circumstances, as defendant contends, and the learned court below held, must necessarily depend in large measure upon the facts and conditions existing or reasonably appearing to exist at the time the agreement was made (Wood's Est., 272 Pa. 8,

12, 115 A. 865; Detre's Est., 273 Pa. 341, 349, 117 A. 54[2]).
In Brown's Est., 287 Pa. 499, at 503, 135 A. 112, it was
said: "In the determination of what is business judg-
ment, too much stress must not be laid on retrospection.
Our after-sight is not to be the sole judge, though it may
be useful." In Chambersburg Saving Fund Assn.'s App.,
76 Pa. 203, 227, we said: "It is well settled that a trustee
shall not be surcharged by a court of equity for a loss
which has occurred, in case he has exercised common
skill, common prudence and common caution; but for
supine negligence,[3] or wilful default he shall be respon-
sible: Twaddell's App., 5 Pa. 15; Moore's App., 10 Pa.
435; Springer's Est., 51 Pa. 342." See also, Semple's
Est., 189 Pa. 385, 42 A. 28; Wood's Est., supra; Detre's
Est., 273 Pa. 341, 350, 117 A. 54; Taylor's Est., 277 Pa.
518, 528, 121 A. 310; Kline's Est., 280 Pa. 41, 44, 124 A.
280; Dempster's Est., 308 Pa. 153, 159, 162 A. 447. The
same rule applies at law.

What were the facts when the agreement was made?
The parties to the agreement were the Company, Evan
Randolph, designated as manager, and the five banks
to whom the Company owed bank loans of $2,668,901.

---

[2] See also Costello v. Costello, 209 N. Y. 252, 103 N. E. 148, 152;
Green v. Crapo, (Mass.) 62 N. E. 956, 957; McCartin v. Adminis-
trator of Traphagen, 43 N. J. Eq. 323, 11 A. 156, 165.

[3] In Gardner's Est., 199 Pa. 524, 528, 49 A. 346, such negligence
was found in failure to proceed for collection of a note and renew-
ing it without security; in Watson v. Scranton Trust Co., 240 Pa.
507, 87 A. 845, (to be considered with Nay Aug Lumber Co. v. Same,
240 Pa. 500, 503, 87 A. 843, involving the same mortgage) in per-
mitting public sale for about one-third the value of the property in-
stead of postponing sale after an announcement was made bound to
deter bidders; in Colonial Trust Co.'s App., 241 Pa. 554, 88 A.
798, in making distribution to some bondholders and ignoring oth-
ers; in Taylor's Est., 277 Pa. 518, 121 A. 310, in failure within rea-
sonable time to convert nonlegal investments received from testator;
(cf. Brown's Est., 287 Pa. 499, 135 A. 112); in Kline's Est., 280 Pa.
41, 124 A. 280, in unnecessary delay in receiving the trust property
from the executor.

The notes then due the Tradesmens Bank amounted to $280,000. In the agreement, the Company made representations of solvency expressly to be relied on as the basis of agreement by the other parties. The five banks agreed to lend $2,750,000 on notes to mature February 1, 1930. As collateral security, the Company assigned to the manager, for account of the banks, all its cash on hand, accounts receivable, merchandise, completed and in process, and raw materials (value, $2,500,000) with specified powers to enable the manager to enforce the collateral as his judgment dictated. The agreement provided for renewal at six months conditioned on a business showing generally specified.

The record gives the financial standing of the Company, as of October 5th—"the nearest four-week closing period" of its books, preceding negotiations resulting in the agreement. A certified public accountant, who for some years had audited the books of the Company, testified that on October 5, 1929, the net book value of the fixed assets, after deducting $1,440,629.40 for depreciation, was $4,451,657.41; the net worth was $2,363,551.58, representing, as the witness testified, "what would be left over for the stockholders, after all creditors, including bondholders had been paid." Bonds in the amount of $1,415,000 were outstanding. During the six months ending July 6, 1929, the company had lost $483,743. Between July 6th and October 5th a profit of about $48,000 was made. What was not foreseen was that from October to the end of December the Company would lose about $90,000. An important fact in the evidence is that the value of the mortgaged real estate (excluding machinery) was appraised in August, 1930, in the receivership proceedings, at $1,500,000;[4] it must therefore have

---

[4] The record quotes from the appraisement as follows: "The conditions attending a sale of real estate of this character, at the present time, are unusual for the following reasons: 1. The general market is quite inactive, there being very few buyers for any class of real

been worth at least that sum October 28, 1929. As to the possible effect of the value of the security on the bondholders' right to participate in the distribution of other assets, and the extent of the participation, if bankruptcy proceedings had followed, see Bankruptcy Act, section 57 (e), (h), 11 U. S. C. A., section 93; Dodge Sales and Engineering Co. v. First Nat. Bank of Pittston, 266 Fed. 364 (C. C. A. 3); In re O'Gara Coal Co., 12 Fed. (2d) 426 (C. C. A. 7); In re Davis, 174 Fed. 556; Bugh's Est., 95 Pa. Superior Ct. 29. This element was worthy of, and may have received, consideration at the time. It must therefore be given due weight now.

Pursuant to the terms of the agreement, the manager took charge. Manufacturing continued. The banks loaned $2,750,000. The Company repaid its existing bank loans, with interest, aggregating $2,668,901.14. The business was conducted until the following March 11, 1930, when, in consequence of the Company's condition then appearing, the manager began liquidating the security in the interest of the banks as authorized by the agreement. There is no evidence that defendant participated in any manner in the administration of the agreement beyond contributing its proportion of the new loan and receiving payment on account from time to time. The manager was not an officer or employee of the defendant corporation. As a result of his liquidation, $2,-722,500 was repaid on the bank loans, the Tradesmens Bank receiving $288,911.70 on account of its loan of

---

estate. 2. This type of property, even in a normal market is among the most difficult to move. 3. The circumstances incident to this situation necessitates a 'forced sale.' Taking all these factors into consideration, the appraisers are of the opinion that the actual market valuation of the said land and buildings is as follows:

| | |
|---|---|
| "Unit No. 1 ......................... | $1,452,250.00 |
| "Unit No. 2 ......................... | 47,750.00 |
| "Total ......................... | $1,500,000.00" |

$291,830. This liquidation was about completed, when, on June 17, 1930, receivers were appointed by the United States District Court on a bondholders' bill filed June 7, 1930, default having been made in the payment of interest due June 1, 1930. When the receivers took charge they found that substantially the only assets remaining were the land and buildings, machinery and equipment covered by the lien of the mortgage. During the receivership, the mortgage was foreclosed. On May 6, 1930, the appellant Bondholders' Protective Committee was formed and received deposits of $1,249,500 bonds with coupons due June 1, 1930. The mortgaged property was sold in foreclosure to the committee's agent for $226,000 in April, 1931. Altogether the committee received $301,942.63 on account of deposited bonds and interest; they claim a large sum said to have been lost in consequence.

The mortgage provided that the property bound was the land, buildings, machinery and equipment "constituting the manufacturing plant of said Company thereon erected, it being the intention of this mortgage to include as part of the real estate all the buildings, machinery, tools, fixtures, equipment and appliances erected or used as part of the said plant." But it also provided "Anything in this mortgage contained to the contrary notwithstanding, this mortgage shall not be construed as subjecting in any manner to the lien hereof any of the following described property, viz.: cash, bank deposits, bills, notes and accounts receivable, choses in action, contracts of purchase or sale, contracts for payment of money, shares of stock, bonds, mortgages and other securities owned by the Company, materials and supplies, goods in process, manufactured goods, good will, trademarks and trade names, and all other property of every kind and character, not hereinbefore expressly assigned and conveyed, or intended so to be." It was this property that was pledged under the loan agreement.

Section 11 of article III provided that the Company would "maintain current assets at least equal to two times its current liabilities," and "at least equal in amount of all outstanding indebtedness including the face value of all bonds then outstanding."

Section 14 of article III provided: "The trustee shall have power in its discretion to waive in writing any or all of the provisions of section 11 of this article III for such period or periods as it may from time to time approve, and shall not incur any liability or responsibility to any parties whatever by reason of its exercise or refusal to exercise such discretionary powers."

While there had been no default in the payment of interest on the bonds, the ratio of current assets to liabilities, when the loan agreement was made, had fallen below that specified in section 11, article III. On June 9, 1926, the trustee, in writing, waived the provisions of this section, the waiver to become void on the Company's failure to maintain current assets at least $500,000 in excess of current liabilities. This waiver was executed by defendant's predecessor in the course of a transaction then consummated "for the purpose of providing for the enlargement and economical conduct of Fleisher's business." Three years later, when the loan agreement of 1929 was executed, the current assets were less than $500,000 in excess of current liabilities, constituting a default in that respect, though one which the trustee was expressly authorized to waive. The mortgage also provided: "The trustee shall not be required to take notice of any default hereunder unless specifically notified in writing of such default by the holders of at least twenty-five per cent (25%) in amount of the bonds then outstanding, and, until so notified, the trustee may assume that no default has happened. . . ." It also provides: "The trustee shall not be liable for any error of judgment or the exercise of its discretion hereunder; . . . Finally, and generally, the trustee, save for its own wilful

default or negligence, shall not be personally liable to anybody."[5]

Article IV, section 1, repeats that certain personal property (as quoted above) shall not be construed to be subject to the lien of the mortgage and then continues with respect to that excepted property: "The Company shall have power at all times to manufacture, use and consume and to sell, pledge and otherwise dispose of and deal with any and all such property in this section above described, in the same manner and to the same extent as if this mortgage had not been executed." The bonds were issued and were held by the bondholders, subject to this expressly reserved right to pledge these assets. The exercise of this right was absolute and was not limited to periods when there was no default, always assuming that no steps to enforce the mortgage were in process. In considering appellant's charge that the loan agreement was a fraud, it is therefore to be observed that, in pledging this property as collateral, the Company acted pursuant to a right expressly reserved in the mortgage and subject to which the bondholders purchased.

The trustee was required to act in good faith and, as required by the rules stated, to exercise that degree of care, skill and intelligence required in the circumstances. With regard to the immunity provision quoted, both parties agree that the applicable rule is given in the Restatement, Trusts, Tentative Draft No. 3, section 214, as follows: "A provision in the trust instrument is not effective to relieve the trustee of liability for breach of trust committed in bad faith or intentionally or with reckless indifference to the interest of the beneficiary, or of liability for any profit which the trustee has derived from a breach of trust." See, also comments a, b and c, page 122 et seq.

The defendant trustee is not responsible for error in judgment honestly made. The divided interest resulting

[5] See Bell v. Title Trust and Guarantee Co., 292 Pa. 228, 140 A. 900; Newhall v. Norristown Trust Co., 280 Pa. 195, 124 A. 337.

from being trustee for bondholders and creditor of the Company, created a condition requiring close scrutiny: cf. Northampton Trust Co. v. Northampton Traction Co., 270 Pa. 199, 112 A. 871. The Company was solvent and, judging by the business of the immediately preceding three months, was making money. Defendant's debt was relatively small compared with the total bank loans, and with the bonded debt; it joined in the agreement in which an independent manager was appointed to receive the pledge of the Company's assets and to see that the Company's business was properly conducted, and, if necessary, to liquidate the collateral. If we assume, in the light of the subsequent events requiring liquidation, that nothing was gained by operating under the agreement that would not have been realized by liquidating its business in October, we have not advanced in the solution of the problem presented by the record. On October 5th the books showed a net worth of $2,363,551.58 after allowing for payment of all creditors including bondholders, with current assets $327,765.03 in excess of current liabilities. There had been no default in the payment of interest on the bonds, and the only default (in the ratio of current assets to current liabilities), once waived, was one which the trustee was expressly authorized again to waive. What would prudent business men in like circumstances have done? Would they have closed the plant and liquidated? Or, in view of its solvency, and the profitable turn in its business in the preceding three months, would they have attempted to continue?

In reviewing the wisdom of what was then concluded to be expedient, we have for consideration the contemporary views of persons at the time interested in the bonds as well as in the Company. The Company's representations, contained in the agreement, and their intended effect, have been referred to above. In addition, it appears that one of the depositing bondholders was a member of the board of directors of the Company when the agreement came up for action by the board before it

was adopted and was executed; he voted in favor of it. Certainly the approving action of a director of the Company who was also a bondholder, familiar with the facts set forth and the transaction provided for, is of importance in now determining whether this evidence should be submitted to a jury to determine whether defendant erred in taking the same view and, by so doing, became, as appellants charge, a fraudulent conspirator. In addition, Behr, a witness, also a member of the board of directors, testified that while he held neither stock nor bonds, he was probably "put on the board as a watch dog for the bondholders." This witness was connected with the banking firm (Dillon, Reed & Company) that originally marketed the bonds for the Company. He testified: "While I was on there because of the fact that our firm sold the bonds, naturally as a director of the corporation I had an interest in its general welfare." He informed the members of his firm of the transaction. There is no suggestion in the record that these members of the board acted otherwise than for the best interest of all parties concerned in the enterprise; they were not connected with defendant; their knowledge and their participation (though Behr, of Dillon, Reed & Company, did not vote on the resolution) must be taken as evidence supporting the wisdom of the transaction in the light of the circumstances appearing at the time to parties whose interests may be said to have been measurably opposed to the defendant's interest as a loan creditor.

Appellants call attention to the default in maintaining the ratio of current assets to liabilities, and also to the fact that the trustee did not notify the bondholders of the making of the agreement, or take steps to prevent it. The mortgage provided that the trustee need take no notice "of any default hereunder unless specifically notified in writing of such default by the holders of at least twenty-five per cent (25%) in amounts of the bonds then outstanding, and, until so notified, the trustee may assume that no default has happened." No such notice had

been given by or on behalf of the bondholders. The only existing default was one that the trustee was authorized to waive. The mortgage contained no provision for keeping the trustee advised of the names and addresses of the bondholders. While it is perhaps generally possible for a trustee with little trouble to acquire such information, the failure to do so and to notify the bondholders of the execution of the agreement will not sustain the charge of breach of trust, made against the defendant. As has been stated, two directors of the Company, one a bondholder, and the other "the watchdog for the bondholders," were advised of the negotiations for the agreement and of the corporate proceedings authorizing its execution.

Appellants also point to the fact that the defendant received payment of a large part of its loan. The relation of bank and customer began before defendant became trustee by the merger with the Guarantee Trust and Safe Deposit Company. There is nothing in the evidence that would justify our concluding that defendant's receiving payment of loans, in the circumstances described above, was a breach of trust. See Conover v. Guarantee Trust Co., 88 N. J. Eq. 450, 102 A. 844, at page 850, affirmed 106 A. 890. If the record had shown that the Company was insolvent when the agreement was made, and the trustee knew or should have known the fact, a different question would be presented. Appellants also contend that by the agreement the bondholders were deprived of a right, to which they were entitled, to participate pro rata with the bank creditors in the funds distributed by the manager, and that defendant should have procured for them the right so to participate by instituting insolvency or bankruptcy proceedings based on the agreement, and that this omission constituted a breach of trust. As we were informed at the argument that litigation on the subject is pending against the manager, we refrain from discussing it further than to remark that, for the purpose of determining whether the evidence should have been submitted to the jury, it is sufficient to say that the evi-

dence shows that the Company was solvent at the time and that apparently the bonds were amply secured.

As appellants charge "a fraud upon the rights of the bondholders," it may be well to note that "While fraud may be proved like any other fact, by evidence tending to establish its existence, yet it is a serious accusation and is not to be lightly inferred": Mead v. Conroe, 113 Pa. 220, 228, 8 A. 374; Bader v. Kell, 301 Pa. 139, 146, 151 A. 683; Walter's Exr. v. Martin, 274 Pa. 529, 532, 118 A. 434; Macpherson's Est., 260 Pa. 492, 496, 103 A. 887. We all agree that the evidence is insufficient to sustain the breach of trust alleged.

The suit was originally brought by a bondholders' committee, on behalf of depositing bondholders; when the case was called for trial, two nondepositing bondholders were joined as plaintiffs. Defendant objected, and here renews the objection, that plaintiffs cannot join their rights of action. In view of the conclusion reached on the merits, it is unnecessary to consider this objection.

Judgment affirmed.