## Barnes's Estate.

Argued May 7, 1940. Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, BARNES and PATTERSON, JJ.

*Carl H. Anderson,* with him *Weimer & Bennett,* for appellant.

*Frederic L. Clark* and *George W. Griffith,* with them *John Randolph Young* and *Shields, Clark, Brown & Mc-Cown,* for appellee.

Opinion by Mr. Chief Justice Schaffer, June 24, 1940:

This is a proceeding brought by Thomas Barnes, II, to have his aunt, Rachel Barnes, removed as trustee of the estate of his grandfather, Thomas Barnes. The Orphans' Court refused to remove her. Petitioner has appealed.

Thomas Barnes died January 11, 1911. Included in his estate was all the stock in the Barnes & Tucker Company, a bituminous coal mining corporation. This stock, together with other property of the decedent, was bequeathed to his son, John Barnes, as trustee, the income to be distributed among the testator's children and grandchildren until the death of the last child. The fifth paragraph of the will provided that the trustee was to vote the stock and be elected president of the corporation. It was also directed that upon the death of John Barnes, the Orphans' Court of Cambria County should appoint a successor trustee. John Barnes complied with the provisions of the will, was elected president of the corporation, and he personally managed it until his death on July 3, 1930. The beneficiaries of the trust at the present time are Rachel Barnes, Ann Barnes Hartsell, Ruth Barnes Mull and Margaret Barnes Post, surviving daughters of Thomas Barnes, Ruth Barnes Shirk, daughter of Jane Barnes Johnstone, a deceased daughter of the testator, and Thomas Barnes, II, John Barnes, Jr., Sara Mary Barnes Polley and Amy Barnes Tyson, children of John Barnes.

August 4, 1930, Rachel Barnes, upon the petition of all of the beneficiaries of the trust then living, including appellant, except John Barnes, Jr., and Amy Barnes Tyson, who were then not of age, was appointed substituted trustee by the Orphans' Court and thereupon was elected president of the Barnes & Tucker Company. The assets of the estate at this time were in excess of $3,000,000, $1,600,000 represented by stocks and bonds in no way connected with the coal business.

It is appellant's contention that the substituted trustee should be removed because: (1) Under the terms of the will, it was the testator's intention that the trustee should actively manage the business of Barnes and Tucker, and Rachel Barnes has neglected and failed to perform this duty, having delegated the duty of management to her nephew, John Barnes Mull, (2) the extension of credit by Barnes and Tucker to the Byrd Coal Company was negligence amounting to mismanagement, (3) the exclusive sales contract with United Eastern Coal Sales Corporation is likely to prejudice the interests of the trust estate, (4) the substituted trustee is incompetent to perform her duties.

Following the petition for removal, all of the surviving children of the testator filed an answer denying the charge of waste and mismanagement and averring that they were entirely satisfied with the management of the estate and the corporation and asserting that they had full confidence in the competence and good faith of Rachel Barnes as a fiduciary and would view with alarm her removal as trustee. An answer was also filed by Ruth Barnes Shirk, granddaughter of the testator, and only child of Jane Barnes Johnstone, averring that she had no knowledge of Barnes & Tucker Company, knew nothing of the various transactions which the petitioner alleged had resulted in loss to the company and requesting the Orphans' Court to require the petitioner to offer evidence to substantiate his allegations of mismanagement and loss.

Ruth Barnes Shirk has a one-sixth interest under the will of the decedent and a like interest is held by Ruth Barnes Mull, Margaret Barnes Post, Ann Barnes Hartsell and Rachel Barnes. They, therefore, have a five-sixths interest in the trust. Thomas Barnes, II, the petitioner, has a one-twenty-fourth interest and his brothers and sisters, John Barnes, Jr., Sara Mary Barnes Polley and Amy Barnes Tyson, have similar interests. The three last named did not join in the peti-

tion for removal, although at the hearing, in which they took no active part, counsel who appeared for Thomas Barnes, II, also appeared for them.

In the fifth paragraph of the will, the decedent provided: "I do hereby order and direct that my son, John Barnes, shall be elected President of said 'Barnes and Tucker Company.'" The thirteenth paragraph reads: "In the event of the death, resignation, or removal of my son John Barnes as Trustee of the 'Barnes and Tucker Company' and the 'Barnesboro Light, Heat & Power Company' stocks, the Orphans' Court of Cambria County, on petition presented, shall appoint some suitable and competent person to succeed to the Trust created and the execution thereof." It will be noted that this provision does not direct that the substituted trustee shall succeed to the presidency of the coal company, only to "succeed to the Trust."

Rachel Barnes acted as President of Barnes & Tucker Company from the time of her appointment as trustee to December 24, 1936, at which time John Barnes Mull was elected president. The reason given by Miss Barnes for resigning the presidency and electing her nephew, John Barnes Mull, was that she never intended to continue as president, but only took over its duties at the request of her sisters until some of the heirs would be old enough to assume it, that her nephew, who was then a young man, offered to help to relieve her in the situation which had become very tense owing to the business depression, that he had worked for the company for three years, and when she saw that he, in her judgment, was capable of assuming the presidency, she turned it over to him. She said in her testimony that she did not wish to launch herself on a career as a business woman, because she was not of the age to do so and conditions in the business world were too depressed for her to undertake it, that she was merely keeping the place open for one of the heirs who would show willingness and ability to assume it.

It is argued by appellant that the thirteenth clause of the will requires the substituted trustee to act as active manager and president of the Barnes & Tucker Company. We are unable to subscribe to this conclusion. John Barnes, testator's son, named by him as trustee and directed to be president of the coal company, was an experienced coal executive. No requirement was placed upon the Orphans' Court in naming a substitute for him, that a like qualification of managerial ability should be possessed by the person substituted in his place. The argument made by appellant that the substituted trustee has improperly delegated the duties imposed upon her by the will in making John Barnes Mull president of the coal company falls by the wayside, as it is based upon the assumption that the will required her to act in this capacity.

The main contention of appellant is that by extending credit to a corporation, Byrd Coal Company, through which a loss of $176,932 was sustained, which was augmented to the sum of $246,417, because of credits extended to its successor, the Newbyrd Coal Company, the substituted trustee has demonstrated negligence in carrying on the trust which amounts to mismanagement. Much of the long record, in which a great deal of unnecessary evidence would seem to have been taken, is devoted to this phase of the case. When the situation which confronted the substituted trustee is taken into account, the charge of mismanagement fades away. In 1923, Barnes & Tucker Company entered into a contract with the Public Service Company of New Jersey for the sale and delivery of 1,000,000 tons of coal per year for a period of ten years at a base price of $2.85 per ton. The fulfilling of this contract disposed of all the output from the mines of the corporation for the period named. Rachel Barnes came to the trusteeship when the ten year contract, which afforded an outlet for all of the coal produced by Barnes & Tucker Company was nearing its end. While that contract existed, the company

needed no other customers for its coal and had no others. She as its president was faced with the problem of finding new outlets for its products or closing down the mines. This she endeavored to do through the Byrd and the Newbyrd Companies. The depression was at its worst. The bituminous coal industry was demoralized, as this record shows, and as everyone having any knowledge of that industry knows. That these sales ventures resulted in losses does not convict her of mismanagement of the trust, the worst that can be said is that they turned out to be mistakes. A mere error of judgment honestly made is not ground for removal: *Drueding v. Tradesmens National B. & T. Co.*, 319 Pa. 144, 179 A. 229. All that the courts require of a trustee is common skill, common prudence and common caution: *Carwithen's Est.*, 327 Pa. 490, 194 A. 743, and cases there cited. Apparently the failure of the Byrd Coal Company, which went into bankruptcy, was largely due to the dishonesty of one Gladstone, who managed it and who turned out to be an embezzler.

It is further alleged that it was unwise and improvident to enter into an exclusive sales contract with a coal selling corporation, United Eastern Coal Sales Corporation, because it also has the exclusive sales agency on a commission basis for the products of other mines, including those in which officers of the sales corporation are interested, and which are rivals in the coal business of the Barnes & Tucker Company. In considering this, account must be taken of the fact that during the continuance of the ten year contract, Barnes & Tucker Company needed no sales force or sales agency. At first after the contract ended, the Barnes & Tucker Company endeavored to set up its own sales force. This in coal mining is an expensive undertaking, because salaries and other expenditures of the selling part of the business are continuous, whether coal is sold or not, whereas under an agency contract such as here entered into,

the cost is only for coal sold. United Eastern Coal Sales Corporation is a large selling organization employing some fifty salesmen in nine offices scattered from Albany to Minneapolis, each in charge of a district manager. In disposing of this feature of the case, the court below said: "Petitioner cannot predicate the grave charge of mismanagement upon his own unsubstantiated suspicions of the contract particularly in view of his counsel's statement: 'We have not sufficient data to determine whether an arrangement similar to the United Eastern contract is advisable at this time.'"

It is argued that Miss Barnes is incompetent to perform the duties of the trust estate. Our reading of the record leads us, as it did the court below, to no such conclusion. Since giving up the presidency, she has acted as chairman of the Board of Directors of the Barnes & Tucker Company. She appears to be a woman of intelligence. She has a large interest in the enterprise. She is a member of a family which has been actively engaged in the coal business throughout her lifetime. She was familiar with her brother's policies and method of operation and with the management and personnel during his lifetime. She has largely maintained the organization which he built up and as far as it can appear from a reading of the record in cold type, she has in her nephew, John Barnes Mull, as president of the company, a highly educated, now fully experienced executive, who also has an interest in the concern. He is now thirty-nine years old.

No complaint is made as to the management of assets of the trust other than the coal company.

A trustee will not be removed at the mere whim or caprice of a beneficiary; some substantial reason must be shown before a fiduciary will be replaced: *Hughes's Est. (No. 1)*, 319 Pa. 321, 179 A. 577; *Hartman's Est.*, 331 Pa. 422, 200 A. 49. This is particularly true where, as here, only one beneficiary desires the trustee's removal

and that beneficiary represents a minority interest: *Bailey's Est.*, 306 Pa. 334, 159 A. 549. As was said by Chief Justice KEPHART in *Mathues's Est.*, 322 Pa. 358, 185 A. 768, "The removal of a trustee is a drastic action, which should only be taken when the estate is actually endangered and intervention is necessary to save trust property." We agree with the learned court below that nothing appears on this record which would warrant the removal of the respondent.

Decree affirmed at appellant's cost.