Martin's Estate.

Argued November 14, 1938.

Before Keller, P. J., Cunningham, Baldrige, Stadtfeld, Parker and Rhodes, JJ.

*Robert Ruppin,* with him *Harold G. Ripple,* for appellants Nos. 188 and 189, and appellee No. 193.

*Harris C. Arnold,* of *Arnold & Bricker,* for appellant No. 193, and appellees Nos. 188 and 189.

OPINION BY RHODES, J., March 3, 1939:

We have before us three appeals which arise from the same record. They were argued at the same time, and will be disposed of in this opinion, as they all relate to the adjudication, and the exceptions filed thereto, in the estate of Anna W. Martin, deceased.

Upon the adjudication of the account of Willis G. Kendig, executor of the last will and testament of Anna W. Martin, deceased, credit claimed by him amounting to $1,200, as the result of loss on the sale of two mortgages, was disallowed, and he was surcharged in that amount; the claim of grandchildren of John B. Martin (husband of decedent who predeceased her) against the estate was allowed in the amount of $1,561.48 principal and $1,823.80 interest, a total of $3,385.28; exception to credit claimed by the executor for payment of notes of decedent in favor of her daughter, Anna W. Martin, amounting to $3,823.55 was dismissed. At the audit evidence was produced on the issues raised by the exceptions to the adjudication. Thereupon the auditing judge increased the surcharge on the sale of the mortgages to $1,900; the exceptions to the allowance of the grandchildren's claim and to the credit claimed by the executor for the payment of Anna's notes were dismissed, and, as modified, the adjudication was confirmed absolutely. These appeals are taken from the decree.

The material portions of the will [1] of Anna W. Mar-

---

[1] "Item. I order and direct that all of my just debts, and funeral expenses be paid by my hereinafter named Executors as soon after my decease as may conveniently be done. ......

"Item. All of the rest, residue and remainder of my estate, I direct my hereinafter named Executor to convert into cash, either at public or private sale.

tin, deceased, dated February 20, 1928, and the codicil[2] thereto are printed in the margin. As the adjudication stands, the residuary legatees, children of decedent, will receive nothing, but there is sufficient to pay Anna $1,609.61 on account of the legacy of $4,000 given to her in the codicil.

(1) In No. 189, October Term, 1938, the appeal of Willis G. Kendig, executor, from the surcharge of $1,900 on the sale of the two mortgages is opposed by the residuary legatees, and the grandchildren to whose claim we have referred previously.

When decedent died, on February 24, 1936, she was the owner of two mortgages on real estate in the city of Lancaster. One was in the amount of $1,500, and secured on premises No. 240 East Liberty Street, but had been reduced to $1,400. It was subject to a first mortgage of $2,500 held by a third party. The other mortgage was in the amount of $3,500, secured on No. 713 Sixth Street, and had been reduced to $3,000. The latter mortgage was recorded on April 15, 1924, at 4:30 p. m., and fifteen minutes later another mortgage, in the amount of $500, to a third party, was recorded,

---

"Item. After my estate is so converted into cash, I direct that the same shall be divided into ten equal shares, or parts, and I give one share to my daughter Lizzie Zimmerman; one share to my son Menno Martin, one share to the children of my son Phares Martin, one share to my son Mahlon Martin, one share to my son John Martin, one share to my daughter Amanda Weaver, one share to my daughter Minnie Weaver, one share to my daughter Anna Martin, one share to my son Noah Martin, one share to my son Elam Martin, or to their respective heirs. ......"

[2] "In consideration of the faithful care and attention that my daughter, Anna W. Martin, has given to me for many years I give and bequeath unto my said daughter, Anna W. Martin, the sum of $4,000.00, out of my residuary estate before the same is divided into ten equal shares as I have directed in my said will and I direct my above named Executor to pay to my daughter all of my indebtedness to her in addition to the above legacy of $4,000.00."

which mortgage is still in existence. The Sixth Street property was sold to the mortgagor by Kendig and another, and Kendig testified that both mortgages were given for the purchase money. In the inventory the Liberty Street mortgage was appraised at $1,500 (an apparent error because everyone concedes that it had been reduced to $1,400), and the Sixth Street mortgage at $2,200. Both mortgages were sold at public sale, the Liberty Street mortgage for $500 and the Sixth Street mortgage for $2,000. This represented a loss of $1,900 on the face value, and $1,200 on the appraised value. The court below first surcharged the executor in the latter amount, but subsequently, after the audit, increased the surcharge to the former amount.

We are mindful that in such appeals as the present we are limited to ascertaining whether there is evidence to support the findings of fact, and whether the findings of fact support the decree. If the evidence supports the findings, and the findings in turn justify the decree, the decree will not be set aside. *Pusey's Estate,* 321 Pa. 248, 260, 184 A. 844. See, also, *Boyd's Estate,* 315 Pa. 283, 286, 172 A. 718.

In sustaining the surcharge the court below based its action on the failure of the executor to obtain an adequate price for the mortgages. The court also concludes that the executor in selling the mortgages at public sale failed to exercise the sound business judgment and prudence which the law demands of all trustees. It is not alleged by any one, and it does not appear from the testimony, that the mortgages were not sold for the highest and best prices that could have been obtained for them at the time of the sale. The finding of the court as to the inadequacy of the prices was not justified by the evidence, as the executor was not bound by the testimony as to the value of the real estate on which the mortgages were secured. We think in the instant case the prices which the mortgages brought at public sale established their values. It was not incum-

bent upon the executor to foreclose on the mortgages and purchase the properties upon which they were secured. Failure to utilize this method of liquidation does not indicate failure to exercise sound business judgment or lack of prudence on the part of the executor. The executor had tried for nearly a year to sell these mortgages in the ordinary course of business, but had never succeeded in obtaining an offer for either one. Under such circumstances the executor was not obliged, as the court below intimates, to resort to foreclosure. If this method had been followed the estate might have sustained a greater loss than resulted from the sale of the mortgages at public sale. It was only after the executor was unable to dispose of the mortgages that they were advertised for sale. "In the determination of what is business judgment, too much stress must not be laid on retrospection": *Brown's Estate,* 287 Pa. 499, at page 503, 135 A. 112, at page 113. In proceeding as he did, the executor clearly exercised common skill, common prudence, and common caution. There was no testimony to show gross or supine negligence or wilful default in any manner upon his part, and he should not have been surcharged by the court below for the loss which occurred to the estate in the liquidation of these assets. See *Keller's Appeal,* 8 Pa. 288; *Springer's Estate,* 51 Pa. 342; *Drueding et al. v. Tradesmens National Bank and Trust Co.,* 319 Pa. 144, 147, 179 A. 229. The mortgages in question were regularly advertised before sale. The sale was well attended and fairly conducted, and at least six or seven of the parties in interest were there. The mortgages were sold in the customary manner, and there was competitive bidding on both of them. It is true that the second mortgage on the Liberty Street property was incorrectly advertised. The advertisement stated that it was on premises No. 140 East Liberty Street, although it was actually upon premises No. 240 East Liberty Street. This was corrected at the sale. The mortgage on the Sixth Street

property was advertised as a $3,500 mortgage. At the sale it was announced by the executor that this mortgage had been reduced to $3,000, and was, in his opinion, a participating mortgage, participating with a mortgage of $500. This announcement was perhaps mistakenly due to the fact that both mortgages on the Sixth Street property had been recorded at nearly the same time, the $3,500 mortgage having been recorded fifteen minutes prior to the $500. There was no evidence of any protest or objection to the sale proceeding. Neither this mortgage nor the $500 mortgage, although they may have been given for purchase money, was protected by the Act of May 28, 1915, P. L. 631, §1, because they were not given by purchaser to seller. Section 1 of the Act of May 28, 1915, P. L. 631, and section 1 of the Act of March 28, 1820, P. L. 141, which it amended, were repealed by section 2 of the Act of April 27, 1927, P. L. 440. See *Commonwealth Title Insurance and Trust Co. v. Ellis*, 192 Pa. 321, 43 A. 1034. The executor, a lawyer of long standing, having acted in good faith, is not liable for this mistake of law, if such there be, or for errors of judgment. See *During's Appeal*, 13 Pa. 224; *Bradley's Appeal*, 89 Pa. 514; *Kline's Estate*, 280 Pa. 41, 124 A. 280; *Dempster's Estate*, 308 Pa. 153, 158, 162 A. 447. Moreover, there was competitive bidding, and it does not appear that the amount realized was less than it otherwise would have been. The court below made no express finding as to the value of the mortgages at the time they were sold. It apparently concluded that the value of the real estate on which these mortgages were secured exceeded the encumbrances by a sufficient margin to make the mortgages worth face value, and that therefore the mortgages should not have been sold, but foreclosure proceedings should have been instituted. Foreclosure may have required the investment by the estate of more than $2,500 in cash in addition to the costs of foreclosure.

Under the circumstances, the sale of the mortgages at public sale was clearly within the judgment and discretion of the executor, and in the absence of any evidence and finding to the contrary the fair and reasonable value of the mortgages for which the executor must account, was the amount realized at the public sale.

The accountant (executor and appellant) should not have been surcharged in the amount of $1,900, being the difference between the principal balance due on the mortgages and the amount for which they were sold at public sale. The adjudication must therefore be modified accordingly. Assignments of error are sustained.

(2) In No. 188, October Term, 1938, Anna W. Martin, daughter of decedent, appeals from the dismissal of her exceptions to the allowance of the claim of the grandchildren of John B. Martin for the principal of a trust fund created in his will for his son Abraham. Appellees are said grandchildren. The will of John B. Martin, who died on March 8, 1916, was dated September 28, 1915, and provided, after giving him a legacy of $2,000: "That of the share of my son Abraham in my estate there shall only be paid to him absolutely the sum of one thousand dollars ($1,000) and the balance thereof of his said share with the exception of the sum of six hundred dollars hereinbefore mentioned in the event he is a member of said Russelites, shall be paid to his mother, Anna Martin, to be held by her in trust, under the following terms and conditions, viz: to hold and invest the same in good securities and to pay the net annual interest and income received therefrom to my said son, Abraham, and at his death the said principal sum together with all accumulated interest shall be paid to his issue, if any, and in default of lawful issue then in equal shares to all my grandchildren then living, their heirs and assigns; but in the event that said Trustee of my son Abraham should at any time during his lifetime think and believe that my said son, Abraham, would make good use of said money and

that it would be to his interest to have the same, then I order and direct said Trustee in her discretion to pay to my said son, Abraham, the aforesaid principal sum so held in trust together with all interest and income due and accrued thereon and thus end said trusteeship."

According to the adjudication filed in the estate of John B. Martin, deceased, on June 14, 1917, Abraham's mother, the decedent, was awarded $1,561.48 under the terms of the trust above quoted. Kendig, the executor, testified: "Q. What did she do with that money? A. Turned it over to me immediately, as the guardian of Abraham Martin, with the statement that Abraham Martin was as well able to take care of his money as any of the rest of the children, he was a good boy and she was going to give it to him, and she wanted him to have it; that was the substance of the statement; she never invested the money as trustee, she turned it over immediately. Q. Did you, therefore, receive it as guardian for Abraham immediately after the adjudication was filed in the father, John B. Martin's, estate? A. I received the amount as set forth in my account as guardian of Abraham Martin, from the estate of John B. Martin, and that included the award to Mrs. Martin, as trustee for Abraham Martin. Q. Was Abraham Martin killed in service? A. Yes, in 1918, October, he was killed in France. Q. And then did you file your account as guardian? A. I then filed my account as guardian. Q. And after your account was confirmed and adjudicated did you turn over the money then to Anna Martin, in conformity with the adjudication? A. I did, and took her release. Q. You have that release? A. I have." Abraham was a minor when his father died, and Kendig was appointed guardian of his estate. Kendig's account as guardian shows a charge as follows: "July 13, 1917 Received from the Estate of John B. Martin $2,561.48." In the petition for adjudication of his account as guardian of Abraham's estate Kendig stated that Abraham had died in October, 1918, "a minor,

unmarried and leaving to survive him a mother, Anna W. Martin." The balance shown by the account was awarded to his mother, the decedent.

The claim of the grandchildren was allowed by the court below, as stated at the beginning of this opinion. Apparently the contention of appellees is that the entire transaction was a device to eliminate the remaindermen under the terms of the gift, and to substitute the decedent in their place; that the payment to Kendig as guardian of Abraham was a breach of the trust imposed upon decedent, for which her estate is liable. We think that this position cannot be sustained.

In arriving at its conclusion the court below said: "How could Abraham 'make good use of said money' when he was in the service of his country in France?" There is no evidence that he was. The record supplies no information as to where Abraham was when the money was turned over to his guardian. The opinion continues: "What possible benefit would he derive from the transfer of said fund from his trustee to his guardian? The facts in this case clearly proved the answer— none. Abraham never was able to return from France to enjoy the benefits of his inheritance. A discretion vested in a trustee for the benefit of the beneficiaries cannot be exercised as in the case at bar, by the trustee for his own benefit unless the instrument creating the trust in clear unequivocal language permits it. The will of John B. Martin does not contain such language, and the claim of the grandchildren must be allowed."

In allowing this claim of the grandchildren of John B. Martin against the estate of Anna W. Martin, deceased, the court below apparently relies on the following facts as showing an abuse of discretion by decedent in terminating the trust: (1) Abraham's absence from the United States at the time of payment; (2) he could derive no benefit from the payment to his guardian; (3) the trust was terminated for decedent's (the trustee's) benefit.

146

1. As we have already stated, there is no evidence that Abraham was absent from the United States at the time of payment.

2. Under John B. Martin's will the corpus of the trust was to be paid over whenever the trustee "in her discretion ...... at any time during his [Abraham's] lifetime" should think and believe that Abraham "would make good use of said money and that it would be to his interest to have the same." The trustee was given a discretionary power to terminate the trust at any time, and in such a case the exercise of the power is not subject to the control of the court, except to prevent an abuse by the trustee of her discretion. Restatement, Trusts, vol. 1, §187; vol. 2, §334 (d). It was not essential to the termination of the trust that Abraham should derive an immediate benefit, or that it should be paid to him directly for a specific purpose. The donor did not limit the trustee to any particular time or purpose, nor did he stipulate that the trust was to continue at least until the beneficiary attained his majority. On the contrary, he said "at any time during his [Abraham's] lifetime." As Abraham was not of age at the time, payment to his guardian was proper and did not constitute a breach of the trust.

3. To find that the trust was terminated for the trustee's benefit is viewing the matter retrospectively instead of in the light of conditions existing when the payment was made. Abraham was then alive, and there is no evidence that he was abroad, or even that he was then in the army. The statement of the court below can be supported only by indulging the unnatural presumption, for which there is not a scintilla of evidence, that the decedent contemplated the early death of Abraham, either in the war or from some other cause, and wished to place herself in position to inherit. We cannot subscribe to that view.

We find no reason in the record which would warrant an interference with the exercise of the discre-

tionary power conferred upon the trustee. The will of John B. Martin empowered the decedent to terminate the trust in her discretion. There was no evidence that the discretion was abused, and the claim of the grandchildren should not have been allowed. In view of our conclusion, it is unnecessary for us to consider the question raised relative to the statute of limitations.

Assignments of error 1, 2, 3, 4, and 5 are sustained.

(3)  In No. 193, October Term, 1938, Amanda M. Weaver, a daughter of decedent and one of the residuary legatees, appeals from the dismissal of the exception filed to the credit of $3,823.55 claimed by the executor for payment of the face amount of a series of demand notes given by decedent to Anna W. Martin, another daughter. The provisions of the codicil to decedent's will, dated October 15, 1929, have been set forth in the margin. The dates of the notes (except one not in controversy dated in 1935) ranged from January 22, 1920, to December 10, 1930. Appellant contends that the notes were barred by the statute of limitations; that the codicil did not remove the bar of the statute; and that the testimony of Kendig, the executor, was incompetent and insufficient to do so. We think that these arguments are inapplicable because our construction of the codicil leads us to conclude that the direction to pay the indebtedness to Anna was a gift, the amount of which was to be determined at the time when decedent died, for the will took effect and spoke as of that time. See *Dembinski's Estate*, 316 Pa. 61, 173 A. 314. To hold otherwise is to strip this testamentary provision of all meaning contrary to the established rule that a construction is to be sought which will, if possible, render every word of a will operative, rather than have some words become idle and nugatory. *Brennan's Estate*, 324 Pa. 410, 415, 188 A. 160; *Sarver's Estate*, 324 Pa. 349, 352, 188 A. 141. All legal obligations of the decedent held by Anna would have been entitled to payment out of her estate without mention in her will,

although she had previously made the usual provision for the payment of debts, "a formal direction, which means absolutely nothing": *Agnew v. Fetterman,* 4 Pa. 56, at page 62. See *Dembinski's Estate,* supra, p. 63. Therefore, if decedent had intended nothing more than that, she could have remained silent, and the law would have executed her purpose. But instead of doing so, she made a codicil to her will in order to direct the payment of what she owed to Anna in addition to a legacy of $4,000. In our opinion she thereby manifested a clear intent to make a gift to Anna of whatever was due from decedent to her.

"There is a boundary of honor and even of honesty, however undefined, beyond which the law has no jurisdiction—there are duties which it cannot, and many others which it should not, enforce. ...... When a claim is barred by the statute of limitations, it ceases to be a legal, and becomes a mere moral right. The duty is not discharged; but the remedy is transferred from the forum of the law to the forum of conscience": *Kyle v. Wells,* 17 Pa. 286, at page 289. In the case of decedent the latter forum provided a remedy in the nature of the codicil above quoted. Where the construction of a will is involved, precedents are of little value *(Brennan's Estate,* supra, p. 414), and counsel have not cited, nor have we been able to find, appellate authority involving the precise factual situation before us in the case at bar. However, we think an analogous situation prevailed in *Sinclair's Appeal,* 116 Pa. 316, 9 A. 637. There the testator, one Hance, in his will made in 1885 provided, page 320: "It is my will and I do order, that the balance due my old creditors, whose claims were compromised, be paid in full." He had failed in 1877, and in 1883 had made a compromise with his creditors, paying them 25 per cent which was received in full satisfaction of debts, interest, and costs. Sinclair, who held a judgment for the amount due him, satisfied his judgment in 1883. It was held that under

this provision he was entitled to be paid his original claim with interest, treating the composition payment as a partial payment at the date when made. Mr. Justice CLARK said, at page 320: "It is true that the provision for Sinclair as one of his 'old creditors' is to be regarded as a legacy to him. The compromise having been fully executed, Hance was legally discharged from all liability to Sinclair; the original debt was merged in the judgment and the judgment was satisfied. In a legal sense, therefore, there was nothing 'due' Sinclair; the debt had been discharged; and the interest, as incident to the debt, ceased to accrue when the debt was extinguished. But, in a less restricted and more popular sense, that may be said to be due which in justice and propriety ought to be paid. When the testator directed that 'the balance due his old creditors whose claims were compromised' should be paid, he of course did not mean the balance which was legally due to them, for that would be to give the provision no effect whatever. He meant that his executors should pay to them the balance which was justly due and ought to be paid to them respectively, although there was no legal obligation resting upon him for payment thereof, either debt or interest. But if the creditors ought in justice to receive the debt, it is alike just that they should receive the interest; the latter was 'due' in the same sense as the former; the payment of the balance due includes both; yet the money, to which Sinclair is entitled under the will, is neither debt nor interest. It is a legacy the amount of which however is to be computed upon the footing of his previous claims." See, also, *Knauss' Estate,* 148 Pa. 265, 23 A. 894.

The executor, Willis G. Kendig, who was counsel for decedent during her lifetime, testified over objection that about five days before her death he was summoned to her home, where she handed him a list of her indebtedness to her daughter, Anna W. Martin, and directed him to see "that these notes were paid." The

list disclosed indebtedness of $3,823.55 evidenced by the notes, the execution of which by decedent is not questioned. The testimony of the witness was objected to on account of the relationship of attorney and client, a confidential relationship between the witness and decedent prior to her death. Decedent could properly tell the witness what she wanted him to do as executor, and what she wanted him to say to others. To this he could testify. It does not violate any confidence, nor does it come within the rule which appellant attempts to invoke. The court below committed no error in overruling the objection and admitting the testimony of this witness. There was no conflict between the testimony of the witness and the provisions of the will and codicil.

It is our conclusion that the intention of the testatrix was clearly expressed in the codicil to her will. She did not intend that the payment to her daughter be confined to legal obligations subsisting at the time of her death. She wanted her daughter Anna to receive from her estate "all of my indebtedness to her." We do not think that the word "indebtedness," as used by the testatrix, was limited to the notes of the testatrix, which were no more than six years old at the time of her death. Assignments of error are overruled.

The decree of the court below is reversed, and the record is remitted with direction to modify the adjudication in accordance with this opinion, and make the distribution accordingly.

The costs are to be paid as follows: Appeal No. 189, October Term, 1938, by appellees; appeal No. 188, October Term, 1938, by appellees; and appeal No. 193, October Term, 1938, by appellant.